UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| RAMON SILVA,<br><br>                          Plaintiff,<br><br>    v.<br><br>CAMERON WALKER, *et al.*,<br><br>                         Defendants. | Case No. C19-1294-RAJ-MLP<br><br>REPORT AND RECOMMENDATION |

## I.    INTRODUCTION AND SUMMARY CONCLUSION

This is a civil rights action proceeding under 42 U.S.C. § 1983. Plaintiff Ramon Silva filed the instant action while he was confined in the King County Jail ("Jail") in Seattle, Washington as a pretrial detainee. Plaintiff is now in the custody of the Washington Department of Corrections. Plaintiff alleges in his complaint that Defendants violated his Eighth Amendment rights when they used excessive force against him, failed to protect him from self-harm, and refused to decontaminate him after spraying him with pepper spray. (*See* Dkt. # 5, Complaint (Compl.) at 6-7.) Plaintiff identifies four Jail employees as Defendants in his complaint: Sergeant

REPORT AND RECOMMENDATION
PAGE - 1

Cameron Walker, and Officers Jason Edmond, Daniel Molina, and Barrett Horn. (*Id*. at 1, 3.) Plaintiff seeks damages for the alleged violations of his federal rights. (*Id*. at 7.)

The Court dismissed some of Plaintiff's claims on a motion to dismiss previously filed by Defendants. (*See* Dkt. ## 11, 16, 23.) Two claims now remain: that Plaintiff's prolonged restraint and exposure to pepper spray without decontamination constituted excessive force and deliberate indifference to his medical needs. (Dkt. ## 16, 23.) Defendants now move for summary judgment with respect to those claims. (Dkt. # 33 (Mot.).) Plaintiff has filed a response opposing Defendants' motion (dkt. # 39 (Resp.)), and Defendants have filed a reply to Plaintiff's response (dkt. # 41 (Reply)). The Court, having reviewed Plaintiff's complaint, Defendants' motion for summary judgment, and all briefing of the parties, concludes that Defendants' motion for summary judgment should be granted and Plaintiff's complaint and this action should be dismissed with prejudice.

## II.    BACKGROUND

Plaintiff was arrested in February 2018 and was charged in King County Superior Court with domestic violence second-degree assault and domestic violence fourth-degree assault for assaulting his girlfriend. (Dkt. # 34, Declaration of Ann Summers (Summers Decl.), Ex. 1.) He was convicted, following a bench trial, and was sentenced on November 9, 2018 to a term of 84 months confinement in the Washington Department of Corrections. (*Id*., Ex. 2.)

On July 29, 2018, while Plaintiff was in pretrial detention at the Jail, Sergeant Walker was advised that Plaintiff had spit in the face of a Jail officer while the officer was passing out the lunch meal. (Dkt. # 35, Declaration of Cameron Walker (Walker Decl.), ¶ 3; Resp., Ex. A.) Sergeant Walker was further advised that Plaintiff had a large piece of grout or concrete in his

possession that he had pulled from the wall of his cell and was using to cut himself. (Walker Decl., ¶ 5; Resp., Ex. A.) Sergeant Walker went to Plaintiff's cell and confirmed that he did, in fact, have a large piece of grout he was using to scratch his left forearm and his cell window. (Walker Decl., ¶ 6.) Sergeant Walker spoke with Plaintiff for several minutes and attempted to convince him to turn over the piece of grout, but Plaintiff refused. (*Id*., ¶ 7.)

Jail officers Daniel Molina, Jason Edmond, and Barrett Horn joined Sergeant Walker at Plaintiff's cell where they all attempted to convince Plaintiff to relinquish the piece of grout, but Plaintiff refused to turn it over and refused to be handcuffed. (*Id*., ¶¶ 12, 13.) Plaintiff became agitated and began making threatening comments and gestures towards the officers. (*Id*., ¶ 14; Resp., Ex. A.) Sergeant Walker advised Plaintiff that he would be pepper sprayed if he did not place the grout on the pass-through and/or turn around to be handcuffed. (Walker Decl., ¶ 15.) Plaintiff still refused to comply, and Sergeant Walker directed Officer Horn to deploy pepper spray. (*Id*., ¶ 16; Resp., Ex. A.) Officer Horn deployed a short burst of pepper spray through the open pass-through causing Plaintiff to run to the back of his cell. (Walker Decl., ¶ 17; Resp., Ex. A.)

Sergeant Walker ordered Plaintiff to come to the door and be handcuffed, and Plaintiff walked towards the door laughing and gesturing, apparently unaffected by the pepper spray. (Walker Decl., ¶¶ 18-19; Resp., Ex. A.) Sergeant Walker ordered Officer Horn to deploy another burst of pepper spray and, following the second burst, Plaintiff handed over the piece of grout and allowed himself to be handcuffed. (Walker Decl., ¶¶ 20-21; Resp., Ex. A.) Given Plaintiff's earlier spitting incident, a mesh spit mask was placed over Plaintiff's head to prevent him from spitting on the officers, and the officers then removed Plaintiff from his cell and secured him in a

restraint chair while his cell was cleaned and decontaminated. (*See* Walker Decl. ¶ 22-23, 25; Resp., Ex. A.)

A Jail health nurse examined the cuts on Plaintiff's arm, and the officers offered to assist Plaintiff in decontaminating from the pepper spray exposure, but he refused. (Walker Decl., ¶¶ 26-27.) Plaintiff also refused several offers from the Jail health nurse to wash off the pepper spray, stating he did not want it washed off even though he complained it was causing him some discomfort. (*See id.*, ¶ 28; Resp., Ex. A.)

Once Plaintiff's cell had been decontaminated, officers removed Plaintiff from the restraint chair and took him back to his cell where they secured him on a restraint board in a seated position and placed a helmet on his head for his protection. (Walker Decl., ¶¶ 29-30.) As officers exited the cell, Sergeant Walker again asked Plaintiff if he wanted assistance in removing the pepper spray, but Plaintiff declined. (*Id.*, ¶ 31.) Plaintiff was placed on fifteen-minute checks while he was secured on the restraint board. (Resp., Ex. A) The restraints were removed at 3:50 p.m., approximately four and a half hours after they were applied, because Plaintiff was deemed to no longer be at risk of engaging in self-harm.[1] (*See* Mot. at 7; Dkt. # 36, Declaration of Michael Vernon (Vernon Decl.), ¶ 3 and Ex. 1.)

Sergeant Walker video recorded part of the officers' interactions with Plaintiff on July 29, 2018. (*See* Walker Decl., ¶¶ 10-11 and Ex. 1.) The video, which was submitted as evidence

---

[1] Defendants' evidence on this point is somewhat confusing. Sergeant Walker states in his declaration that it was 11:21 p.m. when officers left Plaintiff's cell after placing him on the restraint board on July 29, 2018. (*See* Walker Decl., ¶ 31.) The restraint log for that date does not show what time Plaintiff's restraints were applied, but it does show the restraints were removed at 3:50 p.m. (*See* Vernon Decl., ¶ 3 and Ex. 1.) Given that the series of events leading to Plaintiff's restraint began at approximately 10:40 a.m. on July 29, 2018 (*see* Walker Decl., ¶ 3; Resp., Ex. A), the Court presumes that Sergeant Walker's reference to 11:21 *p.m.* was incorrect and that he intended to reference 11:21 *a.m.*

REPORT AND RECOMMENDATION
PAGE - 4

in this action, shows the piece of grout Plaintiff had in his possession and confirms that officers repeatedly directed Plaintiff to give them the grout and Plaintiff consistently refused. (*Id.*, Ex. 1.) Plaintiff accused the officers of being "avatars" as he refused their requests to turn over the grout, and he indicated that after he dislodged the grout from the wall "mirror neurons" told him to cut himself with it. (*Id.*)

The video confirms that Plaintiff appeared relatively unaffected by the first burst of pepper spray, after which he still refused to cooperate with officers. (Walker Decl., Ex. 1.) The video shows that after the second burst of pepper spray, Plaintiff hesitated briefly at the back of his cell before finally walking towards the door where officers were directing him to "cuff-up" so they could get him decontaminated. (*Id.*) After Plaintiff turned over the grout and was handcuffed, officers put a thin, loose, mesh cover over his head, explaining to Plaintiff that they were doing so because he had previously spit on an officer. (*Id.*) As officers secured him in the restraint chair, Plaintiff laughed and asked about the type of pepper spray they had used and engaged in further conversation with the officers. (*Id.*) Plaintiff still appeared to be relatively unaffected by the pepper spray at that point. (*Id.*) The video ends with Plaintiff sitting in the restraint chair before he was returned to his cell. (*Id.*)

According to Plaintiff, it was after the camera was turned off that he began to feel the full impact of the pepper spray. (Resp. at 1-2.) Plaintiff claims that once he was back inside his cell, and secured to the restraint board, he began experiencing extreme pain from the pepper spray. (Resp. at 1-2 and Ex. B.) Plaintiff describes experiencing a "firestorm" as "the pepper spray began to soak into every pour [sic] in my body, face and head." (*Id.*, Ex. B.) Plaintiff claims that

fumes from the pepper spray filled his cell and that he choked on the fumes for four hours straight as his face, head, and body burned non-stop. (*Id*.)

### III.    DISCUSSION

**A.    Applicable Standards**

*1.    Summary Judgment Standard*

Summary judgment is appropriate when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial burden of showing the district court "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. The moving party can carry its initial burden by producing affirmative evidence that negates an essential element of the nonmovant's case, or by establishing that the nonmovant lacks the quantum of evidence needed to satisfy its burden of persuasion at trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc*., 210 F.3d 1099, 1102 (9th Cir. 2000). The burden then shifts to the nonmoving party to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must draw all reasonable inferences in favor of the nonmoving party. *Id*. at 585-87.

In supporting a factual position, a party must "cit[e] to particular parts of materials in the record . . .; or show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The nonmoving party "must do more than simply show that there

is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 585. "[T]he requirement is that there be no *genuine* issue of material fact. . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52.

The opposing party must present significant and probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient[]" to defeat summary judgment. *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Nor can the nonmoving party "defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements." *Hernandez v. Spacelabs Med. Inc*., 343 F.3d 1107, 1112 (9th Cir. 2003). The Supreme Court has explained that when opposing parties tell two different stories, one of which is blatantly contradicted by the record so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

*2.    Section 1983 Standard*

In order to sustain a cause of action under 42 U.S.C. § 1983, a plaintiff must show (i) that he suffered a violation of rights protected by the Constitution or created by federal statute, and (ii) that the violation was proximately caused by a person acting under color of state law. *See*

*Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). The causation requirement of § 1983 is satisfied only if a plaintiff demonstrates that a defendant did an affirmative act, participated in another's affirmative act, or omitted to perform an act which he was legally required to do that caused the deprivation complained of. *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981) (citing *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)).

### 3.    Qualified Immunity Standard

Qualified immunity protects government officials from civil liability under § 1983 so long as their conduct does not violate clearly established constitutional or statutory rights of which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

In order to determine if an officer is entitled to qualified immunity, a court must evaluate two independent prongs: (1) whether the officer's conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the incident." *Castro v. County. of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016) (en banc) (citing *Pearson*, 555 U.S. at 232). Either prong may be considered first. *Pearson*, 555 U.S. at 236. When addressing qualified immunity on summary judgment, the Court "may not resolve genuine disputes of fact in favor of the [moving] party" and must view the evidence in the light most favorable to the non-movant. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam).

REPORT AND RECOMMENDATION
PAGE - 8

**B.     Analysis**

As explained above, the claims presently before the Court are Plaintiff's claims that his prolonged restraint and exposure to pepper spray without decontamination constituted excessive force and deliberate indifference to his medical needs. While Plaintiff alleges in his complaint that Defendants' conduct violated his Eighth Amendment rights, because Plaintiff was a pretrial detainee at the time of the alleged incident, his rights derive from the Due Process Clause of the Fourteenth Amendment and not from the Eighth Amendment's prohibition against cruel and unusual punishment. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).

Defendants argue in their summary judgment motion that they did not violate Plaintiff's Fourteenth Amendment rights because use of the restraints was reasonable and did not inflict pain in an unnecessary and wanton way, and because they were not deliberately indifferent to any serious medical need. (Mot. at 7-11.) Defendants further argue that even if they did violate Plaintiff's Fourteenth Amendment rights, they are entitled to qualified immunity because the rights at issue were not clearly established. (*See id.* at 11-14.) Because this Court concludes that Defendants did not violate Plaintiff's Fourteenth Amendment rights, it need not address Defendants' argument that the rights at issue were not clearly established.

   *1.     Excessive Force*

Plaintiff alleges that Defendants used excessive force against him when they pepper sprayed him, strapped him to a restraint board, placed him in a skin-tight spit mask and a helmet, and left him for four hours in the cell where he was sprayed without first decontaminating him. (Compl. at 6-7.) The Due Process Clause protects pretrial detainees from excessive force. *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). To prevail on an excessive force claim, "a pretrial

detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id*. at 396-97. "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case,'" without regard to the officers' underlying intent or motivation. *Id*. (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

The Court must weigh the circumstances from the viewpoint of a reasonable officer at the scene, and must "account for the legitimate interests that stem from the government's need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." *Id*. at 397 (source and internal quotation marks omitted). The non-exclusive list of factors potentially relevant to the assessment of reasonableness include:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id*. (citing *Graham*, 490 U.S. at 396).

The Court concluded, in ruling on Defendants' earlier motion to dismiss, that in light of the facts alleged by Plaintiff in his complaint it was objectively reasonable for officers to deploy pepper spray to force Plaintiff to relinquish the piece of grout he was using to harm himself, and which he refused to turn over to officers, and that it was likewise reasonable for officers to restrain Plaintiff to prevent him from causing further harm to himself while in the midst of a mental health breakdown. (*See* Dkt. ## 16, 23.) The question confronting the Court now is whether it was objectively reasonable for officers to leave Plaintiff on the restraint board for four

REPORT AND RECOMMENDATION
PAGE - 10

hours, in what Plaintiff claims was a skin-tight face mask, without decontaminating him from the pepper spray exposure.

Defendants, in their motion for summary judgment, focus their excessive force argument on the reasonableness of Plaintiff's continued restraint, including use of the restraint board and the mesh head covering, without specifically addressing the reasonableness of the continued restraint in light of the fact that Plaintiff was covered in pepper spray for the duration of the restraint period. The Court concurs with Defendants that, when the evidence is viewed from the perspective of a reasonable officer, the use of continued restraints and a head covering after the initial use force was not, by itself, objectively unreasonable. Plaintiff was not in a sound mental state, having engaged not only in self-harm behavior but also having assaulted the corrections officer who attempted to deliver his lunch that day by spitting in the officer's face.[2] Plaintiff was agitated and uncooperative with the officers who attempted to retrieve the self-harm implement from him, threatening them at one point and clearly demonstrating to officers that he posed a threat not only to himself but to them as well. Under these circumstances, it was not objectively unreasonable for officers to conclude that Plaintiff could not be immediately freed from restraints nor could the head covering be removed. The record makes clear that Plaintiff was released from the restraints once he was deemed to no longer be at risk of self-harm.

The more precise question that must be answered, however, is whether it was objectively

---

[2] The Court observes that though Plaintiff was not charged with custodial assault on this occasion, two subsequent spitting incidents resulted in the King County Prosecuting Attorney's Office filing custodial assault charges against Plaintiff. (*See* Summers Decl., Exs. 5, 7.) Plaintiff was also charged with additional counts of custodial assault for throwing a "slurry" of urine and feces onto the face and body of a corrections officer, and for stabbing another corrections officer in the head with a sharpened pencil. (*Id*., Exs. 3, 5.) All of these custodial assault charges were dismissed after it was determined that Plaintiff was not legally competent to proceed with these cases. (*Id*., Exs. 4, 6, 8.)

REPORT AND RECOMMENDATION
PAGE - 11

unreasonable for officers to leave Plaintiff in restraints and a head covering for several hours while he remained covered in pepper spray. The evidence demonstrates it was not. Plaintiff received multiple offers of assistance to decontaminate from the pepper spray exposure, all of which he refused. (Walker Decl., ¶¶ 27-28, 31; Resp., Ex. A.) The video of the incident shows that though Plaintiff coughed a couple of times as he was being removed from his cell and placed in the restraint chair, he was showing no signs of significant distress as a result of the pepper spray exposure and was, in fact, laughing and talking with officers. (*Id*., Ex. 1.) The video also reveals that the "spit mask" which Plaintiff claims was "skin tight" and "soaked" with pepper spray, was actually a loose fitting mesh cover that did not lay directly against Plaintiff's face but billowed out around his face and appeared to be causing him no distress in the immediate aftermath of his pepper spray exposure. (*Id*.)

Plaintiff, in his response to Defendants' summary judgment motion, claims that it was not until after the camera was shut off and he was taken back into his cell and strapped to the restraint board that he began to experience severe pain from the pepper spray. (Resp. at 2 and Ex. B.) Plaintiff suggests that Defendants should have taken steps to protect him from himself by decontaminating him against his wishes prior to placing him on the restraint board. (Resp. at 2.) Plaintiff offers in support of this suggestion a KCCF staff memo relating to his pepper spray incident in which a KCCF captain stated that though no policy violation had occurred because medical assistance was offered to Plaintiff and his refusal was properly documented, under the circumstances presented "additional actions could have been considered" by the officers, including taking actions "against an inmate[']s wishes in order to protect the inmate." (*Id*. at 2 and Ex. C.)

REPORT AND RECOMMENDATION
PAGE - 12

Regardless of whether forcible decontamination could or should have been considered, the failure to undertake forcible decontamination in the circumstances presented here cannot be deemed objectively unreasonable given that Plaintiff had been defiant and uncooperative with officers, actually assaulting one officer and threatening others, and he showed no signs of obvious distress from having been sprayed. Moreover, the evidence in the record demonstrates that during the period of time Plaintiff was restrained on the restraint board, he was subject to fifteen-minutes checks. (Resp., Ex. A.) It is reasonable to infer that, if Plaintiff had been suffering the degree of pain he describes in his response and his supporting declaration, he would have alerted the officers who conducted these regular checks to his distress and requested assistance. There is no indication that Plaintiff ever complained during the period of his restraint about the effects of the pepper spray or asked to be decontaminated, despite having an apparent avenue to do so.

The evidence in the record demonstrates that it was not objectively unreasonable, under the specific facts and circumstances at issue here, for officers to leave Plaintiff in restraints and a spit mask for several hours without first decontaminating him. Defendants are therefore entitled to summary judgment with respect to Plaintiff's excessive force claim.

### 2. *Inadequate Medical Care*

Plaintiff also alleges that Defendants were deliberately indifferent to his medical needs when they refused to decontaminate him of pepper spray before placing him on the restraint board for an extended period of time. (Compl. at 7.) The Court evaluates a pretrial detainee's Fourteenth Amendment claim alleging a violation of the right to adequate medical or mental health care under an objective deliberate indifference standard. *Gordon v. County of Orange*, 888

F.3d 1118, 1124-25 (9th Cir. 2018) (citing *Castro*, 833 F.3d at 1070).

To establish a Fourteenth Amendment claim, a plaintiff must demonstrate that: (1) the defendant made an intentional decision with respect to conditions under which the plaintiff was confined; (2) the conditions put plaintiff at substantial risk of suffering serious harm; (3) the defendant did not take reasonable measures to abate the risk, "even though a reasonable official in the circumstances would have appreciated the high degree of risk involved – making the consequences of the defendant's conduct obvious;" and (4) by not taking such measures, the defendant caused plaintiff injury. *Id*. at 1125.

"With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily 'turn[ ] on the facts and circumstances of each particular case.'" *Id.* (quoting *Castro*, 833 F.3d at 1071 (quoted sources omitted)). A "mere lack of due care" does not suffice to establish a constitutional violation. *Id.* Thus, a pretrial detainee "must 'prove more than negligence but less than subjective intent – something akin to reckless disregard.'" *Id*.

The record refutes Plaintiff's claim, as set forth in his complaint, that Defendants *refused* to decontaminate him. In fact, the evidence in the record amply demonstrates that Jail staff offered to decontaminate Plaintiff multiple times and Plaintiff refused those offers. As explained above, Plaintiff suggests in his most recent submission that Defendants should have attempted to decontaminate him against his wishes to protect him from himself. However, for the reasons previously noted, Defendants' failure to forcibly decontaminate Plaintiff was not objectively unreasonable.

There is also an absence of evidence establishing that the failure to decontaminate

REPORT AND RECOMMENDATION
PAGE - 14

Plaintiff put him at substantial risk of suffering serious harm or, indeed, that it caused Plaintiff any appreciable injury aside from the typical discomfort associated with the application of pepper spray. Plaintiff's claim that he suffered intense pain for a period of over four hours and was struggling to breath is not plausible given that he apparently could have, but did not, request any relief from either Defendants or other officers during that period. Moreover, the evidence in the record demonstrates that, so far as Defendants were aware, the pepper spray was not causing Plaintiff any significant distress and there was no apparent reason to believe that the failure to forcibly decontaminate Plaintiff would subject him to significant harm.

Finally, to the extent Plaintiff alleges that Defendants should have anticipated his subsequent intense reaction to the pepper spray, and removed it against his wishes, his allegations suggest nothing more than possible negligence on the part of Defendants which is insufficient to establish a violation of a federal constitutional right. Defendants are therefore entitled to summary judgment with respect to Plaintiff's deliberate indifference claim as well.

## IV.   CONCLUSION

Based on the foregoing, this Court recommends that Defendants' motion for summary judgment (dkt. # 33) be granted and that Plaintiff's complaint (dkt. # 5) and this action be dismissed with prejudice. A proposed order accompanies this Report and Recommendation.

## V.   OBJECTIONS

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's

motions calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14) days** after service of objections. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **January 29, 2021**.

DATED this 4th day of January, 2021.

MICHELLE L. PETERSON
United States Magistrate Judge

REPORT AND RECOMMENDATION
PAGE - 16